# STATE OF VERMONT

# ENVIRONMENTAL COURT

Appeal of Sayles                }
                                      }
                                      }     Docket No. 167-9-03 Vtec
                                        }
                                      }

## Decision and Order

Appellant John Sayles appealed from an August[1] 2003 decision of the Development Review Board (DRB) of the City of Montpelier, granting subdivision approval for a two-lot subdivision and Appellant, who is an attorney, appeared and represented himself; Appellee-Applicants David William (" Bill" ) Jolley and Jean Jolley are represented by Robert Halpert, Esq.; Interested Person Lesley Becker appeared and represented herself; and the City is represented by Amanda S.E. Lafferty, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. At the outset of the hearing, Appellant withdrew those elements of Questions 3, 5, 7 and 10 that call for impermissible advisory opinions from the Court, and Appellee-Applicants stipulated to their willingness to be bound by conditions 2, 3, and 4 in the DRB's approval admitted as City's Exhibit 1. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence and the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Appellee-Applicants own an approximately[2] eight- or nine-acre undeveloped parcel of land (" the parcel as a whole" or " the parcel" ) adjacent to Hubbard Park, in the Medium Density Residential zoning district, with 50 feet of frontage along Parkside Drive. The parcel is generally wooded at the present time, but the tree coverage is not dense within the 50-foot-wide entrance to the parcel. The parcel does not contain any mapped wetlands, water bodies, flood zones, deer wintering areas, or rare, threatened or endangered species, pursuant to mapped information provided by the City.

Appellee-Applicants propose to subdivide the parcel into two lots: Lot 1 having an area of just over one acre, and Lot 2 consisting of the remaining land. On Lot 1, Appellee-Applicants propose to construct a single-family residence with attached 2-car garage, and a paved turnaround with room for two additional vehicles to park outside. They propose to remove as few trees as possible, that is, to remove only those trees necessary to put in the house on Lot 1. They propose to install utilities and a driveway to serve Lot 1 within a twenty-five-foot-wide easement on Lot 2; no other development is proposed for Lot 2 at this time.[3] Both lots are served by municipal water and sewer service. Any further development on Lot 2 or subdivision of Lot 2 would require future permits or approvals under the ordinance in effect at that future time.

The parcel is bounded on the east by Hubbard Park, and on the west by the back yards of properties at 35 Bailey Avenue, 37 Bailey Avenue, and 77 Bailey Avenue. The parcel slopes

generally from the east property line (Hubbard Park) towards the west and southwest; a steep area of ledge behind the Sayles and Becker lots drops approximately 16 feet from the elevation of those lots to the elevation of proposed Lot 1. The parcel as a whole includes a swale draining generally from the northeast to the west, so that in its pre-development state the area proposed for development drains into a drainage system on or near the property of 37 Bailey Avenue. The back yards of other properties on the south side of Parkside Drive, including both the Sayles and Becker lots, also drain across the parcel towards the same location. The side yard of the Sayles lot adjacent to the project parcel contains areas that are already wet under present conditions.

The total drainage area for the parcel as a whole is ten acres. Prior to the proposed development, the parcel as a whole would experience a peak flow of 18.03 cubic feet per second during a 25-year storm event, which is the storm event required to be designed for under § 823.A. Assuming that all of the impervious area represented by the roof of the proposed house on Lot 1, the paved driveway area on Lot 1, and the paved driveway from Parkside Drive to Lot 1 on Lot 2 is additional[4] impervious area, and without counting the potential mitigating effect of adding some absorbent fill soils to Lot 1, after the proposed development the parcel as a whole would experience a peak flow of 18.22 cubic feet per second during a 25-year storm event. This increase of 0.18 cubic feet per second represents an increase of 1% for the parcel as a whole, which will drain from the property via the existing drainage swale and drainage structures and will have no negative effect on any of the downgradient properties, and will not significantly increase the height of floodwaters in the drainage system.

The parcel contains a 50-foot-wide strip of land running from the parcel's frontage on Parkside Drive, between the 4 Parkside Drive lot and Appellant's property at 10 Parkside Drive. The driveway for Lot 1 is proposed to run within a 25-foot-wide easement created within that strip, which will curve around behind and close to the property line of Appellant's lot to the house site on Lot 1. Appellee-Applicants have proposed appropriate erosion control measures to control soil erosion during construction.

Appellee-Applicants propose to plant evergreen screening trees along the Sayles property line to screen the driveway curve; however, they have not proposed a specific planting plan, nor have they shown whether sufficient area or suitable soils exist between the proposed driveway pavement and the property line, to accommodate the trees and to accommodate any drainage structures necessary to avoid the ponding of stormwater drainage on the Sayles lot adjacent to the driveway and tree planting area.

In 1990, Appellant received a variance from the 100-foot frontage requirement of the zoning regulations to allow the use of the parcel as a whole for a single-family house. The issuance of that variance was not appealed and became final.

All that is before the Court in the present appeal is the DRB's approval of the subdivision of the parcel as a whole. If the subdivision is approved, the construction of the house on Lot 1 would still require a zoning permit from the Zoning Administrator. That permit does not appear to have been requested[5] from or ruled on by the Zoning Administrator, or appealed to the DRB in the present case.

Questions 3, 5 and 6 of the Statement of Questions

The "purpose" of the frontage requirement in the regulations, the standards appropriate for granting a variance, and whether the 1990 variance would apply to some future subdivision of Lot 2 (or even whether it would apply to any construction on Lot 2) all call for impermissible advisory opinions from the Court. The 1990 variance approved the construction of one house on the parcel as a whole, without having 100 feet of frontage. No more than one house is being proposed for the parcel as a whole. Because Lot 1 will have access to Parkside Drive over the easement or right-of-way, it also needs DRB approval under § 207.A for access via a permanent easement or right-of-way at least 20 feet in width. That access is approved as it places no more burden on the curb cut to Parkside Drive than it would have done if the parcel as a whole had not been divided into two lots. Any application for construction of a house on Lot 2 will have to address the frontage requirement and § 207.A under whatever requirements are in the ordinance at such future time.

Questions 2, 4 and 8 of the Statement of Questions

The change in stormwater drainage from the parcel as a whole, between its pre-development status and its drainage after the proposed development of a house on Lot 1 with its associated parking and driveway areas, will not have any negative effect on any of the adjacent downgradient properties. The potential additional 0.18 cubic-feet-per-second discharge during a 25-year storm event will flow through the existing drainage swale into the sump and culvert associated with the Bailey Avenue properties, and will be handled adequately by that system. Nor will that change in drainage have any effect on the upgradient Hubbard Park or Parkside Drive properties, other than the discussion below regarding Appellant's property.

However, Appellant is concerned that the design of the proposed driveway and the possible addition of soil to plant screening trees between the driveway and his property line, will result in the damming of water between the driveway and his property line, and the backing-up of water onto an already-wet area of his property. The site plan in evidence does not provide the numbers, size, or locations of the proposed screening trees, and does not specify whether sufficient area or suitable soils exist between the proposed driveway pavement and the property line, nor does it show what drainage is proposed adjacent to and/or under the driveway to avoid the backing up of water on the driveway's northerly side or onto Appellant's property. All that is provided is a standard driveway design showing a ditch on one side of the driveway.

In order to meet the requirement of § 823.B that stormwater drainage not negatively affect adjacent properties, it will be necessary to impose a condition that the location, placement and installation of the evergreen plantings and the driveway be designed so as to avoid throwing any additional stormwater drainage onto the Sayles property and to avoid increasing the potential for ponding on that property.

Question 1 of the Statement of Questions

Other than the standards specifically discussed above, the subdivision meets all of the applicable dimensional and other standards in Articles 4, 6, and 8 of the Zoning and Subdivision Regulations. No evidence was presented to the contrary.

Questions 7 and 10 of the Statement of Questions

No proposal for further subdivision of or development on Lot 2 is before this Court in this case. It would be an impermissible advisory opinion for the Court to address what, if any, further subdivision or development might be "appropriate" for Lot 2. Similarly, the question of whether analysis of any future subdivision proposal would include the traffic caused by the proposed single-family house on Lot 1 calls for an impermissible advisory opinion. Any future proposal would have to be examined in connection with the standards applicable in the City's ordinances at the time such future proposal is proposed.

Question 11 of the Statement of Questions

Section 606.C(7) requires a schedule to be submitted for the completion of the improvements proposed in connection with a subdivision application. No such schedule has apparently[6] been submitted. This is understandably required for subdivisions because the streets, utilities, and common improvements for a large residential subdivision, for example, may be installed long before lots are sold and houses are built. By contrast, in the present case, only one house is proposed on one lot. That house will require a zoning permit; Appellee-Applicants have not suggested that the work on the driveway and utility installation over Lot 2 would be commenced before they obtained permission for the construction on Lot 1. Once the zoning permit for the construction of the Lot 1 house were approved by the Zoning Administrator, it would have a two year expiration date. (§ 404.H.) Accordingly, we will only require Appellee-Applicants to submit a schedule for the completion of the improvements if they propose to commence before obtaining their zoning permit for Lot 1, or if they propose to complete those improvements after the expiration of such zoning permit. If such a schedule is submitted, it will have to be ruled on by the DRB as an amendment to the present subdivision approved in this decision.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposed subdivision is approved as shown on Exhibits 1 and 2, with the four conditions imposed by the DRB and the following additional conditions:

A. Appellee-Applicants shall prepare a revised subdivision plan for filing with the City that incorporates the evergreen plantings proposed to be installed adjacent to the Sayles property onto the site plan shown on Exhibits 1 and 2 (which may include one or more additional site plan sheets showing the planting plan and specifications). Each site plan sheet shall contain a key or legend specifying the features, such as the edge of pavement, shown on that sheet. The revised site plan shall specify a placement of and design for the driveway as it passes over the easement on Lot 2, to provide for all of the following: 1) sufficient room and suitable soils for the evergreen screening plantings proposed by Appellee-Applicants; and 2) suitable room for and design of drainage for the driveway to avoid any additional water being thrown back upon Appellant's property and to avoid any additional ponding of water on Appellant's property,

whether due to the construction or placement of the driveway or due to the placement of additional soil for the plantings.

B. If Appellee-Applicants propose to commence construction of any of the improvements on Lot 2 before obtaining their zoning permit for Lot 1, or if they propose to complete the Lot 2 improvements after the expiration of the zoning permit for Lot 1, they shall submit to the DRB a proposed schedule for the completion of the improvements, to be ruled on by the DRB as a proposed amendment to this subdivision. Otherwise, the completion of the subdivision improvements shall occur within the time allowed under any zoning permit issued in the future for construction on Lot 1.

Any other permits required for construction of the house proposed for Lot 1, including any zoning permit, and any state water supply or wastewater disposal permit, remain the responsibility of Appellee-Applicants and are not addressed by this decision. Any development on Lot 2 (other than the driveway and utility lines to serve Lot 1) and any further subdivision of Lot 2 will require approval under the City's Zoning and Subdivision Regulations in effect at such future time.

Dated at Barre, Vermont, this 29th day of September, 2004.

_____

Merideth Wright

Environmental Judge

---

**Footnotes**

[1.]     The notice of appeal referred to the decision as having been "entered" on August 21, 2003, although the copy of the decision accepted in evidence as City's Exhibit 1 is signed by the Chair dated August 12, 2003, and refers to the approval of the application by the DRB on August 4, 2003. The notice of appeal was received by the City on September 19, 2004. No party raised the issue of the timeliness of the appeal.

[2.]     The survey dated November 18, 2003 in evidence as Exhibit 3 (referred to by Appellee-Applicant as an 'earlier' proposal) appears to show either the parcel as a whole or the larger of two resulting lots (labeled as Lot 1) as being 9.12 acres in size, and the smaller of two resulting lots (labeled as Lot 2) as being 1.01 acres in size. The labeling of the lots on that survey is not consistent with the labeling used on the site plan in evidence as Exhibits 1 and 2. To avoid

confusion, we use the labeling convention of the site plan (Exhibits 1 and 2), and refer to the parcel as a whole without a lot number.

3. It appears from the decision appealed from that Appellee-Applicants had proposed a house for each of the two lots, but as the DRB ruled that a house on Lot 2 would require further review, in the appeal before the Court Appellee-Applicants sought approval of the subdivision with proposal for a house only on Lot 1.

4. In fact, some portion of the area on Lots 1 and 2 counted as 'additional' impervious area is already impervious, due to the presence of exposed ledge.

5. At least, no evidence of it was provided to the Court by Appellee-Applicants in this proceeding, and the August 2003 decision of the DRB appealed from (in evidence as City's Exhibit 1) does not mention anything other than a two-lot subdivision approval request as having been before the DRB in that proceeding. While the 2 sheets of the site plan were entered into evidence as Exhibits 1 and 2, the application form and/or narrative were not provided.

6. No narrative or application was presented in evidence, although one was apparently provided to the DRB as it is referred to in the DRB decision.